Morning, Your Honors. Rachel Lerman, Barnes & Thornburg for Appellant Herff Jones. This is a preliminary injunction case, as you all know. And to prevail, the plaintiffs need to show that all four factors in winter are present. And we submit that they found her on at least one, if not all, of those prongs. Yeah, the thing that would help me to have both counsel address is what difference this preliminary injunction makes. Because, as I understand it, Mr. Potlongo is, or was at the time, still working for Jostens, right? That's my understanding. And the only way he can be ousted from working for Jostens is if, ultimately, he loses on the underlying lawsuit. Well, he says that he will be fired by Jostens if he loses. Well, I know that, but I mean, since he's working there now, I don't understand what function the injunction plays. I assume that he's working there now. And in what territory? I actually don't know. It's not in the record. I guess the critical moment will come when schools start up again, and the representatives compete for business with individual schools to see who is going to be able to come to campus and sell certain products. And the way it works is it's not like Barbary Bar Passers, where they all get to come. The school picks one seller, picks Herb Jones to sell rings on campus this year. So the students don't look at different vendors. They just buy a school ring and make a check out to Herb Jones because that's the only offer on the table. And Mr. Potlongo acknowledges that he would like to be able to go in and talk to his old clients and convince them to sell Johnston's products instead of Herb Jones products. In the same geographic area that he worked for you, right? Well, it's not just geographic area. There are five counties, and there is a list and two schedules. It's a little complicated. Okay, but I think if you want to talk about it being a geographic area, you want to talk about being a list of campuses, that's fine. Right. But if you prevail, he won't be able to do that, right, at those schools? Not at those schools, but there are many other schools in those counties that aren't on that list. For instance, there's only three schools listed in Orange County. There are lots of schools in Orange County that aren't on that list. Okay. There's also lots of schools in L.A. that aren't on that list, because I've checked my kids' and my neighbor's kids' schools, and they aren't on the list. So even if you prevail and enforce this agreement, he would not be able to, or this restrictive clause, he would be able to go to other schools not on the list on behalf of Johnston's, right? Yes. That's, I think, Judge Graber's question. He would also be able to sell to the schools on the list if he were selling products that aren't on Schedule A, so cheerleading uniforms, you know, coal horns, banners, whatever else. What I'm having difficulty grasping in this case is just the practicality of it. If we were to reverse the preliminary injunction, what would change, if anything, in Mr. Potlago's work life during the pendency of the litigation until it's finally resolved? Well, there is a summary judgment hearing that has been held off. No, I understand that eventually. Well, the litigation would go on on the merits, right? The litigation would continue on the merits until there is an answer. But what I'm trying to figure out is, as an absolutely practical matter for him, is there any difference in his day-to-day life with the preliminary injunction and without the preliminary injunction until the merits are determined? Well, if there's no preliminary injunction, then he... Then what? That's the point. Then a court can say, you know, you can't be going back to these schools. He's gone to certain schools, high schools, on the list while he worked for you, for your client, and established relationships. That's your contention. He's established relationships with those principals, And now he wants to go back to those very same schools and sell for Jostens. But he's done that for 30 years, yeah. And sell for Jostens. And he can't do that if there's a preliminary injunction, right? Is that the answer to Judge Graber's question? Well, if there's a preliminary injunction against him, he can't do that. Right. If there's a preliminary injunction against us, then he can. Did you move for a preliminary injunction against him? In, I think that's part of the arbitration in Indiana. We did not move for a preliminary injunction against him in California. But, see, that's my point. I don't understand what's different for him. We got a counselor. I don't care who's counselor. I just need to understand sort of the practical answer right now. There's a preliminary injunction against you. If we get rid of it, it seems like a big so what to me because nothing changes for him. I mean, it may be nothing changes for you either, really, except that the litigation gets to continue and get resolved one way or the other. But then they would be free to move for a preliminary injunction against him. And I think that's probably what you want to do. Go back to Indiana and continue the litigation there. Right? That's what you want to do, right? That's right. Okay, so here's what my problem is with this case. I don't think that this is a business at all or that there's any goodwill at issue. This seems to me just to be an exclusive territory slash particular school contract for services. I mean, I think this is kind of a – the contract was kind of a sham that there's not a business. This is – he was working for you and he had this exclusive territory and he was going to go to these schools and sell. So I don't see how you can argue that the goodwill exception applies to this. I just don't even see that there's a business here at all. Okay, let me address that. The cases on goodwill in California are different than this particular business arrangement. But the cases – the thing that they seem most concerned with is a sham transaction means you get paid a dollar or you buy some stock and sell it back for the same price. No, no, can't we just – what I'm saying is despite the language of business and goodwill in your contract, the reality of the situation is that it isn't a business. I mean, it doesn't matter in many senses what language you use if it's not in actuality a true business. Well, the contract defines it as selling the stock for us. I know what the contract says, but I'm saying if we're applying – okay, California doesn't like – strongly disfavors governance not to compete and they have this narrow exception for sale of a business and its goodwill, including its goodwill. So what I'm saying is regardless of how you characterize your relationship, if we're going to apply this narrow exception to you, we have to say, well, was this a sale of a business including goodwill? And I have a hard time seeing this as a business as opposed to just an exclusive territorial sales arrangement. Well, the Palangos side hasn't argued that that definition of business is contrary to California law, which defines business very loosely as just the way you earn your money. And the way he's earning his money is by selling certain Herb Jones products to certain schools with people he's gotten to know and learn all about. And what goodwill are you talking about? Are you talking about Herb and Jones goodwill? Well, there's obviously more than one kind of goodwill here. Yeah, there's a real problem with that, too, because he's not selling you his goodwill. Well, he has built up goodwill with these people over the years that he goes to, let's say the principal is the one who picks which person is going to be on campus selling rings this year. And he goes, hi, Bob. It's me, Ray, again. Let's talk about how we're going to do things this year. And here's your favorite pie. And I know that this is what you, the kind of markup you guys are looking at. And I know how many, I kind of know roughly what it is you guys want. And we work together really well. And, you know, I've already determined and established what it is I can sell to you and how much the markup is going to be. And you like me, we play golf on the weekend, whatever. He knows these people well. And that is probably what keeps the principal from saying, yeah, sure, you sell the rings. Because the rings aren't that different. You know, Jostens ring, Herff Jones ring. My high school was Herff Jones. My boyfriend's was Jostens. And they were both rings, you know. The thing is the relationship with the guy who's going to be there on campus. That's what I want to ask about. Because everyone has briefed and discussed this case as if it's between an agreement between an individual and Herff Jones. But it isn't. It's an agreement between a corporation and Herff Jones. And Mr. Patlago is, I guess, the president and CEO of the corporation. But it seems undisputed that it has a separate corporate form in accordance with the law. And that even though he is the principal who is the one outselling, there is a company. And it has a separate existence. And I'm a little unclear as to how California law works on this point. I think that it's an individual who signs on behalf of the corporation, which is what he did here, can in some circumstances bind himself personally as well. And clearly this agreement tries to do that. It says this applies to all the individual directors and so on and so forth. But what difference does that or should that corporate form make to our analysis of the preliminary injunction? As a practical matter, it hasn't affected the relationship over the years because initially he was just working as an individual. And at some point he created this corporation and began signing using that name. And I don't know what his reasons were. Maybe they were tax reasons. I don't know. But nonetheless, that's what we have in front of us. That's the extant agreement, if I am reading the right one, which is at ER 191 and following. It's between Grads, Us, Incorporated and Herff Jones. So what do I make of that? I don't know the answer to that question. It's never been raised or briefed. You know, as far as I understand, Grads, Us is him and his family, some of whom his daughter does some of the selling as well. And they incorporated for reasons that are not in the record and just continue to work under this contract. They continue to do the special agreements, which are very similar in that territory is exchanged or you could say, you know, the rights to sell at certain schools is exchanged. And then as compensation or consideration, for three years you get half of the profits, half of the profits for three years, which is a substantial amount of money. I think that oral argument, the council suggested it was at least $100,000 a year, and no one disputed that. So he would get half of the profits for the stuff that he sold the Goodwill. And by selling the Goodwill, that means, okay, I know that I'm Ray and John is going to take over, and I'm going to introduce John to my good buddy, the principal, and I'm going to smooth things over and make sure the business is transferred over to him. And, you know, I'll smooth things over for a while as needed to make sure that, you know, this school keeps using Herff Jones rings. Counsel, you're down to under two minutes if you'd like to save some time. Good morning, Your Honors. Christina Kim on behalf of appellees, Ray Palumbo, and Grad Zarros. I'd like to begin by addressing the questions the panel had earlier. The difference that the preliminary injunction makes in function for Mr. Palumbo, I know with all the briefings and throughout the court's ruling as well, we've referred to Palumbo to include both Palumbo and Grad Zarros. The largest effect that it would have and currently has with the preliminary injunction in issuance is that he is able to continue working in the occupation that he has chosen. But why wouldn't he be able to continue anyway? There's been no final adjudication that this limitation is valid. And so it's in litigation. He's working for justice. And so if this injunction went away, he'd still be working for justice unless and until there's a final judgment that says he can't. Wouldn't that be the case? Well, actually, Your Honor, there would be no guarantee that he would, that Jostens would maintain as a representative. Because according to the contract, without an injunction, and if Herff Jones enforces their agreement under 12.1. But they can't enforce it unless a court enforces it, right? Isn't his concern that in the meantime Jostens won't let him go forward because of concern about getting entangled in this litigation for violation of a non-competed? That is one of the concerns for Mr. Patwango. And with the current arbitration in Indiana that is actually ongoing right now, if anything or if Herff Jones attempts to get an injunction in that case that includes the same rights as he would have here, he would be prevented from working, period. So, Mike, this dovetails into the winter factor about irreparable injury. How is this not an economic injury? It's not an economic injury, Your Honor, because if you read 12.1 of the agreement, it actually prevents him from selling any product or manufacturing or servicing any product that's similar in form or function to any of the products he sold at Herff Jones. So why is that not an economic injury? Well, that eliminates his ability to sell any type of graduation or scholastic products, and that is what his occupation has been for the last 33 years. And so why is that not an economic injury? That's what I'm getting at, counsel. Well, because it's not a matter of monetary, because we're not calculating the monetary loss of what he could or could not have sold. We're calculating the fact that he can't sell anything in the industry that he's chosen to work. So he's losing his entire livelihood in the territory, in the geographic area, that he has worked in over 33 years. I don't want to keep just asking the same question, but it strikes me that if that's true, then at the end of the day somebody would need to write a check for your client to compensate him for that lost income. And so I'm trying to figure out why this isn't an economic injury, a purely economic injury. The cases that are cited are very distinguishable. The DACA case, the chalk case are very, very distinguishable. Well, I would turn Your Honor's attention to the cases cited by the lower court. They all show that loss of livelihood is an irreparable harm. And in this case, Mr. Pallanga would be prevented from working. But not because it was an economic injury. Those cases had something else. In the DACA case, there were very young people, and the notion was if they're denied a driver's license, they can't get to their vocational schools or their colleges or their jobs, and they will lose educational opportunities and they'll never catch up. The court's concern was with the trajectory of young people who wouldn't be able to get their driver's licenses. In the chalk case and the two other cases that are cited by the court, one of them involved a person who had a degenerative eye disease and wasn't going to be able to take a bar exam. So that was, of course, going to deny her more than just a paycheck, but really an opportunity to pursue her dream to become a lawyer. And the other person is, you know, a person who had AIDS, and they said, oh, we're not going to deny you a paycheck, but here we're going to move you to the back room and you can work applying for grants. And what the person really loved doing was working with disabled kids. So there was something more there that's not an economic injury. And what I see here in this case is a very legitimate dispute, but it's about an economic injury. I would pose to opposing counsel how they would calculate that, because it's not a matter, like I said, for our client, it's not a matter of calculating how much and how long he can't sell certain things. It's a matter of he won't be able to do what he's been doing for the last 30 years, period. Your briefs repeatedly argue loss of livelihood. Yes, Your Honor. Well, is livelihood something different in your mind than income? Yes. I mean, loss of income I would calculate purely as a monetary set, you know, amount that, oh, we had a contract to sell X number of widgets for the next three years, but we lost that opportunity. So you can calculate that amount. But you could calculate here, an expert could calculate and say he's earned, you know, $214,000 this year, and, you know, he could work for another 20.6 years and it would come out to this much money, and he'd get a big check. Well, the overreaching issue is that it's not a matter of calculating what he can't sell. It's the fact that he can't do his job. This is the livelihood that he's chosen to do for the last 30 years. He's a salesman, and he's a salesman specifically for graduation and scholastic products. If he's not able to sell those products, they're essentially telling him to move to a completely different area and sell completely different products that he has no background information on. And so that's how I calculate loss of livelihood, is that you're not able to do what you've chosen to do in life. But he can. It would be at different schools, right? That's opposing counsel's argument. Can you respond to that? Yes, I would disagree that it's not just at different schools. Because of the restrictions contained in the agreement at 12.1, he would be prevented from selling any similar type of product to any school. So actually they're trying to narrow it to specific schools and specific products, but their agreement itself is opposite to those arguments, and they state that he wouldn't be able to do, sell any similar graduation or scholastic products in the same areas. 12.1 is the paragraph you want me to look at? Yeah, page 197. So I guess the way I would see it is that from inferences that you could draw from that and the fact that he would not be able to sell anything in the territory where he lives for four years, it would also be very difficult for him to, after those four years, get back into that livelihood. He would have lost his contacts and the relationships with all the people that he had been selling to. Someone else would replace him. I have to assume if he's been doing this for 33 years, he's also older. Yes, Your Honor. And I mean, to your point earlier about the fact that the territory is not a business, that is very true. And although he may lose some contacts over the four years, it is not as significant as the fact that because it's not a business and there's no goodwill inherently in himself, there's... Counsel, that's what troubles me about this case, which I asked opposing counsel who didn't, you know, have a reason why this had happened, but this agreement is not between Mr. Potlago and Herff Jones. This agreement is between a corporation, Grads R Us Incorporated and Herff Jones. Mr. Potlago signs as president in his corporate capacity, and Wendy and Brandy Potlago sign as the consenting shareholders. So what is the legal effect of that, if there is any, as to whether this is a business, as to whether it's, you know, just how do we fold in that fact? And it appears from the record that it is a legitimate corporation. It's an actual entity. Yes, Your Honor. If you look at the arbitration action too that Herff Jones has brought against our client, it includes the entity as well as the individual shareholders and individual Ray Potlago. But how does that fact bear on the issue that Judge Wardlaw has been asking about, which is whether there is really a business involved as opposed to an individual's work life? The business we are talking about or that Herff Jones is wanting to, quote-unquote, purchase is the territory that Mr. Potlago has been working in. They have never asked or requested that they purchase the actual corporation, Grads R Us. Right. They don't want to purchase Grads R Us and get that concomitant goodwill.  They want return of the territory. They don't want Mr. Potlago working in that territory anymore. And they're not acknowledging the fact that any goodwill produced was for the benefit of Herff Jones, not Grads R Us or Mr. Potlago in their capacities. So there's no goodwill to transfer because he never owned any. That's what the sham transaction is, is that they're trying to make some kind of a sale of something that doesn't even belong to Mr. Potlago or Grads R Us to try to fit it under the exception of the statute of 16601 and trying to enforce the non-compete. Whereas, as you know, in California, under 16600, every contract that tries to restrain trade or fair competition is void. So that's what we're trying to prevent here. And so we ask the court to affirm the lower court and continue with the preliminary injunction in place during the duration of the litigation until all the merits can be settled. I don't have any other questions. I don't believe that we do have any further questions. Thank you. Ms. Lemon, you have a little bit of rebuttal time remaining. How much do I have? 145, it looks like. Well, first, since neither of us really knows the answer to the corporate structure question, could we write a five-page letter brief addressing that? We'll consider it. Okay. Second, I think it absolutely is a question of monetary damages. He claims he doesn't even own any goodwill, so he can't claim to be losing goodwill. And it's a typical, I don't have income for X amount of time, if that's true because we know he is working for Jostens, although the Jostens contract isn't in the record and I don't really know what his relationship with Jostens is. So even if Jostens fires him, again, that's not irreparable harm under federal Ninth Circuit law because we follow Samson, and Samson says losing your job, getting fired, leaving your job, that's not irreparable harm. Here he chose to leave the job, go to work for Jostens, knowing he was going to run the risk of getting embroiled in litigation with Herb Jones because he wanted to breach the contract. You know, I would submit that that goes to the balance of the equities too. He walked into this. What else? In terms of 12.1, I don't think that has any bearing on the monetary damage question. Even if you, and moving to another point, even if you get away from the goodwill argument, cases like Galante say you can't just walk an employee, or I assume an independent contractor can't just walk away with customers and all that he knows about the customers when he goes to another job. So there's competition, and then there's stealing customers, and you can't do the latter under California law. Thank you, counsel. The case just argued is submitted, and we appreciate helpful arguments from both of you with that. We will be adjourned for this session. All rise.
judges: Wardlaw, Graber, Christen